IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
SOUTHERN DIVISION
No. 7:19-cv-149-BO

| | |
|---|---|
| VOLT POWER, LLC, )<br>    Plaintiff, )<br>)<br>v. )<br>)<br>WILLIAM "BILLY" BUTTS and JOHN )<br>BERKNER, )<br>    Defendants. ) | O R D E R |

This cause is before the Court on defendant William Butts' motions to dismiss for lack of subject-matter jurisdiction and for judgment on the pleadings [DE 52], to stay [DE 54], and to recognize dissolution of the parties' agreed preliminary injunction [DE 57]. For the reasons that follow, these motions are denied.

## BACKGROUND

Plaintiff Volt Power, LLC ("Volt") brought this trade secret and non-compete suit in August 2019 against two former employees—William Butts and John Berkner—who allegedly misappropriated trade secrets and confidential business information before leaving the company in June 2019.

Volt constructs, installs, and maintains electrical transmission and distribution power lines. Comp. ¶ 8, DE 1. Defendant Butts started working for the company in January 2011 and, during his tenure at the firm, was promoted on several occasions, including to Operations Director of the Mid-Atlantic Region in March 2017. *Id.* ¶ 12. In consideration for certain equity grants, Butts agreed to be bound by the restrictive covenants contained in Volt's parent company's Executive Common Unit and Profits Unit Agreement (the "Agreement"). *Id.* ¶ 14, Ex. B. The restrictive

covenants include a non-competition clause that prevents Butts from working for a business that is competitive with Volt for two years in any county or state in which he provided services on behalf of Volt or received confidential information relating to Volt's operations. *Id.* The Agreement also restricted Butts' ability to solicit Volt clients and employees. *Id.* ¶¶ 16, 18.

In June 2019, Volt announced a business reorganization. *Id.* ¶ 19. Butts was offered a role in the reorganized business with lower pay and fewer responsibilities, or a severance package should he decide to reject the demotion. Butts rejected both offers and, on June 24 at 4:44 pm, tendered his resignation from Volt. *Id.* Shortly after resigning, Butts accepted employment with one of Volt's competitors, C.W. Wright. *Id.* ¶ 17. Other Volt employees, including defendant John Berkner, followed Butts to C.W. Wright shortly thereafter. *Id.* ¶¶ 1, 17.

Volt retained a forensic computer examiner to investigate Butts' company-issued laptop, phone, and email account. *Id.* ¶ 21. The investigation revealed that within hours of sending his resignation letter, in the evening of June 24, 2019, Butts forwarded 257 emails from his Volt email account to his personal email account, at least 123 of which were directly related to his work at Volt. *Id.* ¶ 23. Many of the company-related emails contained attachments of files that Volt considered trade secret. *Id.* The files contained information about customer preferences, contracts, bids, and pricing. *Id.* Immediately after sending the emails, Butts deleted them from the "Sent Items" folder of his email account. *Id.* ¶ 24. The forensic investigation also revealed that earlier in June 2019, Butts used a personal USB device to transfer Volt files. *Id.* ¶ 25. The files were organized by client and contained information relating to customer pricing, needs, and preferences. *Id.*

Volt also performed an investigation of Berkner's company-issued equipment, which revealed similar findings. *Id.* ¶ 33. Leading up to his departure from Volt, Berkner used at least

four separate USB devices to copy files containing information Volt considers confidential. *Id.* ¶¶ 34–36.

On August 9, 2019, Volt filed the complaint in this action, bringing claims for (1) violation of the Computer Fraud & Abuse Act, (2) violation of North Carolina's Trade Secrets Protection Act, (3) Conversion, and (4) Breach of Contract. *Id.* ¶¶ 40–60. Volt also moved for a temporary restraining order and preliminary injunction to, among other things, prevent defendants from using or disclosing proprietary Volt information, require defendants to produce all personal and C.W. Wright devices for inspection, and prohibit Butts from working at C.W. Wright. Mot. for TRO, DE 7. The Court denied the TRO motion and set a hearing on the preliminary injunction for September 25, 2019. On September 23, Volt moved to continue the hearing, representing that it believed it could reach an agreement with defendants without the Court's intervention. The Court granted the continuance.

On December 9, 2019, Volt renewed its motion for a preliminary injunction, indicating that the talks had broken down and Butts had declined to agree to a consent injunction. After another continuance related to scheduling, the Court held the preliminary injunction hearing on February 18, 2020. At the hearing, Volt represented that it was no longer attempting to enforce the non-competition provision of the Agreement with Butts. Tr. at 5:6 – 6:24, DE 61. Rather, with respect to its request for injunctive relief, Volt's primary goal was to put in place a forensic protocol through which Volt could gain assurance that neither defendants, nor C.W. Wright, nor another third party had access to its proprietary information. Following the hearing, the parties submitted—and the Court approved—a consent preliminary injunction. DE 50. The consent preliminary injunction required Butts and Berkner to identify which property and information they took, to return any Volt property in their control, and to refrain from disclosing or using Volt information.

3

*Id.* ¶¶ 1–2, 4. It also required Butts to refrain from soliciting Volt employees, to produce a third-party forensic expert to analyze his devices and accounts, and to refrain from soliciting certain Volt customers until Volt received forensic evidence from Butts' expert—to be verified by Volt's expert—that neither he nor a third party have access to Volt's information. *Id.* ¶¶ 3, 6–7. The parties agreed to establish a forensic protocol to govern the analysis of the relevant devices, networks, and accounts. *Id.* ¶ 8. With respect to the provision enjoining Butts' ability to solicit certain Volt customers, the parties asked the Court to set a deadline for its expiration. *Id.* ¶ 9. The Court determined that the provision prohibiting Butts from soliciting Volt customers should remain in effect for the greater of 20 days or through the completion of the forensic protocol. *Id.* The agreed preliminary injunction was issued on February 25, 2020.

Between April 21 and May 1, despite having failed to complete the forensic protocol agreed to in the consent injunction, Butts filed motions (1) to dismiss for lack of subject-matter jurisdiction and for judgment on the pleadings, (2) to stay discovery pending the Court's ruling on the motion for judgment on the pleadings, and (3) for the Court to dissolve the preliminary injunction. Volt has responded in opposition and these motions are ripe for disposition.

## DISCUSSION

Subject-matter jurisdiction

The basis for Butts' challenge to the Court's subject-matter jurisdiction is not entirely clear, though he suggests in passing that Volt does not have standing to satisfy Article III's case-or-controversy requirement. Article III requires a concrete injury that is fairly traceable to the defendant's conduct and redressable by a favorable decision. *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 180–81 (2000). Volt clearly satisfies these requirements. Moreover, there is complete diversity between the parties and plaintiff brings a claim under federal

4

law. Accordingly, the Court has little trouble concluding that it has subject-matter jurisdiction in this action.

Judgment on the pleadings

"After the pleadings are closed—but early enough not to delay trial—a party may move for judgment on the pleadings." Fed. R. Civ. P. 12(c). "[F]or purposes of 12(c), 'the pleadings are closed upon the filing of a complaint and an answer (absent a court-ordered reply), unless a counterclaim, crossclaim, or third-party claim is interposed.'" *Mandujano v. City of Pharr, Texas*, 786 F. App'x 434, 436 (5th Cir. 2019) (quoting 5C Charles Alan Wright et al., Federal Practice and Procedure § 1367 (3d ed. Apr. 2019 Update)); *see also Burbach Broad. Co. of Delaware v. Elkins Radio Corp.*, 278 F.3d 401, 405 (4th Cir. 2002) (pleadings closed after answer filed). In this case, Butts filed an answer and counterclaimed, and Volt has answered the counterclaim. Accordingly, the pleadings are closed, and Butts' motion is timely.

The Court reviews the Rule 12(c) motion under the same standard as a motion to dismiss pursuant to Rule 12(b)(6)—assuming the facts in the complaint as true and drawing all reasonable inferences in Volt's favor. *Burbach Broad*, 278 F.3d at 406. Taking the allegations as true, the Court concludes that Volt has properly alleged its claims.

1. Computer Fraud and Abuse Act

Volt's first claim is brought under the civil action provision of the Computer Fraud and Abuse Act ("CFAA"). 18 U.S.C. § 1030(g). CFAA makes liable one who: (1) "intentionally accesses a computer without authorization or exceeds authorized access, and thereby obtains . . . information from any protected computer[:]" (2) "knowingly and with intent to defraud, accesses a protected computer without authorization, or exceeds authorized access, and by means of such conduct furthers the intended fraud and obtains anything of value[:]" or (3) "intentionally accesses

5

a protected computer without authorization, and as a result of such conduct, recklessly causes damage[,] or . . . causes damage and loss[.]" *Id.* § 1030. In *WEC Carolina Energy Sols. LLC v. Miller*, the court construed the phrases "without authorization" and "exceeds authorized access" to mean that one is liable under CFAA "only when an individual accesses a computer without permission or obtains or alters information on a computer beyond that which he is authorized to access." 687 F.3d 199, 206 (4th Cir. 2012). In that case, an employee allegedly downloaded proprietary information from his company computer before resigning, and then used that information on behalf of a competitor. *Id.* at 201. The court concluded that the employer had not stated a claim under CFAA because it failed to allege that the defendants accessed a computer or information without authorization. *Id.* at 207. "[A]lthough [the defendants] may have misappropriated information, they did not access a computer without authorization or exceed their authorized access." *Id.* Butts contends that this case is on all fours with *WEC Carolina*, and therefore, Volt's CFAA claim fails.

In *United States v. Steele*, however, the court upheld a conviction of a defendant who had secretly and repeatedly logged into the email server of his former employer to take proprietary information. 595 F. App'x 208 (4th Cir. 2014). The court easily distinguished *WEC Carolina* because the defendant's employment status at the time of the misappropriation was not in dispute. *Id.* at 211. In *Steele*, the defendant had left his employment months earlier, which "logically suggest[ed] that the authorization he enjoyed during his employment no longer existed." *Id.*

Here, Volt alleges that Butts forwarded at least some of its confidential information *after* his resignation—albeit, immediately after. Comp. ¶ 23. In addition, Volt alleges that Butts introduced a personal, unauthorized USB device into Volt's system in order to download the information. These allegations state a plausible claim that Butts exceeded his authorized access to

6

Volt's computer network and proprietary information. It would be premature at this stage, taking the allegations in the light most favorable to Volt, to dismiss plaintiff's CFAA claim as a matter of law.

2. Misappropriation of trade secrets

Volt's second claim is misappropriation of trade secrets under North Carolina law. Butts attempts to dismiss this claim by arguing that Volt has not pleaded the claim with sufficient particularity. Butts also argues that as a utility provider, Volt is subject to disclosure laws with respect to its bids and therefore its information cannot be considered trade secret. Finally, Butts argues that Volt has not alleged an act of misappropriation.

"To plead misappropriation of trade secrets, a plaintiff must identify a trade secret with sufficient particularity so as to enable a defendant to delineate that which he is accused of misappropriating and a court to determine whether misappropriation has or is threatened to occur." *Krawiec v. Manly*, 370 N.C. 602, 609 (2018) (quotations omitted). *Krawiec* makes clear that the defining feature of a well-pleaded trade secret claim is that it puts the defendant on notice as to the precise information allegedly misappropriated. *Id.* at 609–11. Volt has met this standard. While the complaint names some general categories of stolen information, such as "technical information, customer lists, sales and marketing strategies, and pricing information," the complaint and supporting exhibits also identify with particularity the specific files that it claims are trade secret. The detail of Volt's complaint and accompanying exhibits puts Butts on notice of what he is accused of misappropriating. It also provides sufficient detail for the Court to ascertain "whether misappropriation has or is threatened to occur." *Id.* at 609.

Butts' other arguments fail as well. It cannot be the case that simply because Volt is required to disclose some information publicly about its governmental customers, the company

7

therefore has no trade secret protection. Butts' argument proves too much. Volt is not seeking to claim as trade secret information that is publicly available. Finally, misappropriation is defined as "acquisition, disclosure, or use of a trade secret of another without express or implied authority or consent, unless such trade secret was arrived at by independent development, reverse engineering, or was obtained from another person with a right to disclose the trade secret." N.C. Gen. Stat. § 66–152(1). Volt alleges that Butts took trade secret information from Volt without consent following his resignation, and that this information has been used in his employment at C.W. Wright. This squarely fits the definition of misappropriation.

3. Conversion

Volt's third claim is conversion, which is the "unauthorized assumption and exercise of the right of ownership over goods or personal chattels belonging to another, to the alteration of their condition or the exclusion of an owner's rights." *Variety Wholesalers, Inc. v. Salem Logistics Traffic Servs., LLC*, 365 N.C. 520, 523 (2012). "The essence of conversion is not the acquisition of property by the wrongdoer, but a wrongful deprivation of it to the owner." *Bartlett Milling Co. v. Walnut Grove Auction & Realty Co.*, 192 N.C. App. 74, 86 (2008). Proprietary information kept in hard copy can be the subject of a conversion claim under North Carolina law. *Se. Shelter Corp. v. BTU, Inc.*, 154 N.C. App. 321, 331 (2002). The Court sees no reason why proprietary information stored electronically should be treated differently. That said, the law in North Carolina is unsettled as to whether merely unauthorized copying of electronically stored propriety information constitutes conversion. *Compare Bridgetree, Inc. v. Red F Mktg. LLC*, No. 3:10-CV-00228-FDW, 2013 WL 443698, at *15 (W.D.N.C. Feb. 5, 2013) (copying computer files deprived plaintiffs of the "exclusive dominion and control over the proprietary information"), *with Strategic Mgmt. Decisions, LLC v. Sales Performance Int'l, LLC*, No. 17 CVS 3061, 2017 WL 3425930, at

*3 (N.C. Super. Aug. 7, 2017) ("[M]aking a copy of electronically-stored information which does not deprive the plaintiff of possession or use of information, does not support a claim for conversion."). The Court need not address this question now because Volt's complaint does not say that Butts merely copied information, but that he transferred it. It would be premature at this juncture to dismiss the conversion claim before Volt can discover whether the files were only copied over or were transferred in a way that deprived it of the information.

4. Breach of contract

The final claim for relief is breach of contract. The Executive Common Unit and Profits Unit Agreement, which contains the relevant restrictive covenants, was signed by Butts, PowerTeam Services HoldCo, LLC, and PowerTeam Management Feeder, LLC. Volt is a subsidiary of PowerTeam Services HoldCo, LLC. Under the Agreement, Butts received equity in PowerTeam Services HoldCo, LLC and agreed to the restrictive covenants. The Agreement makes clear that Volt is, at a minimum, a third-party beneficiary. *Raritan River Steel Co. v. Cherry, Bekaert & Holland*, 329 N.C. 646, 651 (1991). The contract speaks repeatedly of Butts' duties not just to PowerTeam, but to PowerTeam's subsidiaries. The restrictive covenants run against Butts with respect to competing with and soliciting employees and clients of PowerTeam's subsidiaries. The restrictive covenant period begins following termination of Butts' employment from PowerTeam or its subsidiaries. Accordingly, there is little doubt that the signatory parties intended that Volt would benefit from the agreement. Volt can therefore enforce the Agreement in this action.

At the February 18 hearing, Volt explicitly abandoned its attempt to enforce the non-compete provision of the Agreement. Consequently, the Court need not engage with the complex issue of whether the non-competition provision is overbroad. But Volt also plausibly alleges that

Butts breached the Agreement by using and disclosing proprietary information—which he had agreed to keep confidential. *See* Comp. ¶¶ 55–60. Accordingly, Volt has properly stated its claim for breach of contract; Butts' arguments challenging the breach of contract claim are without merit.

The Court finds that Volt's claims are properly alleged and survive Butts' motion for judgment on the pleadings.

Motion to recognize dissolution of consent injunction

The parties submitted an agreed preliminary injunction following the February hearing. A critical aspect of the parties' agreement is that they were to bring in their respective forensic experts to conduct an analysis of Butts' devices and accounts so that Volt could gain assurance that neither Butts nor a third party retained access to Volt's confidential information. DE 50. Now, despite having failed to hire a computer investigator and complete the forensic protocol, Butts asks the Court to dissolve the injunction. Butts contends that the injunction expired on its own terms and that the circumstances warranting the injunction are no longer present.

First, the consent injunction clearly did not expire on its own terms. The sole timeline provision in the agreement, which only relates to Butts' ability to solicit Volt customers, explicitly states that it will remain in place "for the greater of 20 days or the completion of the forensic protocol." The protocol has not been completed, and thus, this provision—along with the rest of the preliminary injunction—remains in effect.

Second, the circumstances have not changed. Volt remains without assurance. From the parties' briefs, it seems that the only change in circumstances is that Volt has been further prejudiced by Butts' failure to fulfill his obligations under consent injunction.

The Court will not dissolve the agreed injunction. Butts is responsible for retaining and paying for his own computer expert. Moreover, Volt need not post security pursuant to Rule 65

10

Case 7:19-cv-00149-BO   Document 69   Filed 07/14/20   Page 10 of 11

because (1) Butts agreed to the preliminary injunction without a provision requiring Volt to post security, and (2) Butts agreed to waive Rule 65's bond provision in the Executive Common Unit and Profits Unit Agreement. DE 1-3 at 22. *Pashby v. Delia*, 709 F.3d 307, 331 (4th Cir. 2013) ("[T]he district court retains the discretion to set the bond amount as it sees fit or waive the security requirement.").

## CONCLUSION

For the foregoing reasons, Butts' motions to dismiss for lack of subject-matter jurisdiction and for judgment on the pleadings [DE 52] and to recognize dissolution of the agreed preliminary injunction [DE 57] are DENIED. The motion to stay [DE 54] is also DENIED. The Clerk is DIRECTED to terminate the outstanding TRO motion [DE 7] and preliminary injunction motion [DE 42] from the docket. The Agreed Preliminary Injunction [DE 50] remains in full effect.

SO ORDERED, this __13__ day of July, 2020.

*Terrence W. Boyle*
TERRENCE W. BOYLE
CHIEF UNITED STATES DISTRICT JUDGE